# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Jefferson Davis, Jr., Appellant,

v.

South Carolina Educational Credit for Exceptional Needs
Children Fund, Respondent.

Appellate Case No. 2019-001231

─────────────

Appeal from Richland County
DeAndrea G. Benjamin, Circuit Court Judge

─────────────

Opinion No. 6014
Heard November 7, 2022 – Filed August 9, 2023

─────────────

## AFFIRMED

─────────────

Jefferson Davis, Jr., *pro se*.

Geoffrey Kelly Chambers, of Green Cove Springs,
Florida, for Respondent.

─────────────

**GEATHERS, J.:** In this Freedom of Information Act (FOIA) litigation, Appellant Jefferson Davis, Jr. (Davis) appeals the circuit court's order granting summary judgment to Respondent South Carolina Educational Credit for Exceptional Needs Children Fund (the Fund). Davis contends the circuit court erred in (1) finding that the Fund is not covered by state law defining a "public body"; (2) finding that the Fund was not supported by public funds; (3) finding that reporting requirements for the Department of Revenue could replace any FOIA obligations the Fund might have; (4) finding that reporting requirements in a 2016–2017 budget proviso were sufficient to replace any FOIA obligations the Fund might have; (5) finding that

reporting requirements in a 2017–2018 budget proviso were sufficient to replace any FOIA obligations the Fund might have; (6) taking into account later legislation when considering the intent behind the budget provisos governing the Fund; and (7) misconstruing legislation that made the Fund permanent.  We affirm.

## FACTS/PROCEDURAL HISTORY

In 2017, Davis began filing FOIA requests with the Fund, which was created by a proviso in the 2016–2017 General Appropriations Act.[1]  The program provides funding for children defined as "exceptional needs children" to attend private schools; in return, those who donate to the Fund receive a state tax credit.  The proviso specifically stated that "[t]he [F]und may not receive an appropriation of public funds."  The proviso also stated that monies raised by the Fund "do not constitute public funds," and provided that the state could not be obligated by the Fund's contracts or other agreements.  It allowed five directors to be appointed by lawmakers and the governor, though it provided that those selections would be made "based upon" recommendations from certain school organizations.  The Department of Revenue (the Department), "[i]n concert with the [F]und directors" was instructed to "administer the fund, including, but not limited to, the keeping of records, the management of accounts, and disbursement of the grants awarded pursuant to this proviso."  Additionally, the proviso required an accounting of the money on June 30, 2017.  Approximately one year later, a virtually identical proviso was passed as part of the 2017-2018 General Appropriations Act.  The program was permanently codified by the General Assembly in 2018.

Davis's first two FOIA requests to the Fund were sent on December 14, 2016. He asked for "notifications of any and all meetings involving the ECENC Fund." Davis also requested:

> 1. Copies of all invoices and payments made on behalf of [the Fund].
>
> 2. Copies of all board meetings and/or actions for [the Fund].
>
> 3. Copies of all brokerage statements for [the Fund].

---

[1] Specifically, Proviso 109.15 established the program.

4. Copies of any employment or contractor agreement with or for the services of [an individual not directly involved in the current litigation].

He sent the requests by mail and emailed them to Tom Persons, who served on the Fund's board. Additionally, on July 10, 2017, Davis sent a request for a copy of the report that the Fund is required to submit to the Department.

On July 25, 2017, attorney Geoffrey K. Chambers responded on behalf of the Fund to Davis's July 10 request. He wrote:

> South Carolina Educational Credit for Exceptional Needs Children Fund is a 501(c) charitable organization. Pursuant to the South Carolina Freedom of Information Act, S[.]C[.] Code Annotated 30-4-10 *et seq.*, and the South Carolina Solicitation of Public Funds Act, []33-56-10 *et seq.*, South Carolina Educational Credit for Exceptional Needs Children Fund is not subject to FOIA.
>
> I believe the documents you seek are public documents. I do not have the documents to provide a courtesy copy. I recommend you request these documents from the proper public body records custodian.

Undeterred, on August 31, 2017, Davis requested documents related to the Fund's "funding formula" for the previous and then-current fiscal year. On September 12, 2017, Chambers responded again, reiterating that the Fund did not believe it was subject to the FOIA and adding:

> Due to pending litigation you have brought regarding Freedom of Information Act requests sent to [the Fund], I have instructed my client not to respond. In the future, I recommend you direct FOIA requests to government entities. As an opposing party in litigation, I ask that you do not send any correspondence directly to parties who have representation.

Indeed, on July 31, Davis had filed a *pro se* complaint for FOIA enforcement in Greenville County, seeking declaratory and injunctive relief. In an order filed

November 7, 2017, the circuit court in Greenville County transferred venue to Richland County in a Form 4 order.[2]

The Fund filed its answer in Richland County on November 20, 2017, essentially denying the substantive portions of Davis's complaint. Davis filed a motion for summary judgment on January 24, 2018. The motion included allegations that that the Fund was created by the legislature; that its board was appointed "by elected government officials"; that the Department helped set up and is authorized to help administer the Fund; that the Department helped the Fund in raising donations through email and social media; that contributions to the Fund could be routed through the state's internet presence; and that the Fund "is publicly listed as a 'State Board and Commission'" on the Secretary of State's website.

In his written summary judgment motion, Davis noted precedent from our supreme court suggesting that some private nonprofits could be subject to the FOIA. He also cited an opinion from the South Carolina Attorney General's Office stating that "a court would likely find the grant [and tax credits][3] authorized by the ECENC proviso likewise constitute 'public funds.'" (quoting *Op. S.C. Atty. Gen.*, January 18, 2018).

In addition, Davis filed an affidavit and multiple exhibits. In the affidavit, Davis complained that he had not received responses to his FOIA requests,[4] had not been notified about board meetings that he believed had occurred since his initial FOIA request, and had reached a state employee's voicemail when he called a number provided for certain donations to the Fund that Davis had found on the internet.

Among the attachments to Davis's affidavit were: (1) the articles of incorporation for the Fund, signed by Rick Reames III[5] as the agent, with the address listed as 300A Outlet Pointe Boulevard in Columbia; (2) the Fund's registration with

---

[2] Initial hearings under FOIA are generally supposed to be scheduled "within ten days of the service on all parties." S.C. Code Ann. § 30-4-100 (Supp. 2022). According to the Fund, one reason this FOIA litigation persisted so long in the circuit court is that Davis incorrectly filed his suit as "complex litigation."

[3] The bracketed words appear in the opinion from the Attorney General's Office, but are omitted by ellipsis in Davis's motion.

[4] According to a memorandum in support of the motion to dismiss filed by the Fund on June 14, 2018, Davis "has received copies of [the Fund's] reports." These statements are not mutually exclusive.

[5] Reames was director of the South Carolina Department of Revenue at the time.

the Public Charities Division of the Secretary of State's office, listing Reames as the "contact person" for the Fund, listing his title as "President," and giving the address of P.O. Box 125 in the 29214 ZIP code in Columbia, as well as listing Reames as the registered agent and providing the same street address as listed on the articles of incorporation;[6] (3) a receipt reflecting a $50.00 payment from the Fund on July 8, 2016;[7] (4) an image of a web page directing potential Fund donors with certain financial instruments to "have your account manager contact" a phone number that Davis said led to the state employee's voicemail;[8] (5) internet communications highlighting the Fund on the Department's website, Facebook page, and Twitter feed; (6) a web page for contributions to the fund at https://ssl.sc.gov/checkout/exceptionalsc/; and (7) results from an internet search of the Secretary of State's Boards and Commissions website showing the members of the Fund's board, and listing the Fund as a board, commission, or committee.

Davis also attached an email chain between Reames and an individual at the South Carolina Chamber of Commerce. Davis characterized the email as support for his allegation that state officials helped raise money for the Fund.[9] The emails indicated that Reames and the individual at the chamber had previously discussed the Fund, and that Reames was hoping the individual could send an "introduction" to members "that might have local decision making and have SC tax liabilities they want to abate." The individual then requested a draft of a potential email from Reames. Reames responded:

> Exceptional SC is the new face of South Carolina's Educational Credit for Exceptional Needs Children. It is an organization established under Internal Revenue Code Section 501(c)(3) that is dedicated to supporting exceptional needs students and families in South Carolina by providing scholarships to attend private schools that meet their needs.

---

[6] Additionally, Reames signed spaces for the Chief Financial Officer/Treasurer of the charity and Chief Executive Officer/President of the charity.

[7] The filing fee for a registration with the Public Charities Division is $50.00.

[8] The number was to be called "for delivery instructions." The same page instructed those who wanted to mail their checks to send them to the Fund at a post office box in Columbia.

[9] At times, because of markings on the emails, they are difficult to make out in the record.

> Donors making financial contributions to Exceptional SC
> not only help these exceptional needs children but also
> receive significant tax benefits, including a state income
> tax credit. The total statewide credit is limited to $10M on
> a first come, first serve basis - and it is already filling up
> fast. Potential donors should act fast so they don't lose this
> opportunity. Click on www.exceptionalsc.org for more
> information.

In the email, Reames indicated that the individual at the chamber should "[e]dit as [they] need to." Reames's signature block in the emails identified him as director of the Department and included a P.O. Box address provided on some of the Fund's paperwork. At least one of the emails Reames sent originated from a dor.sc.gov account.[10]

The circuit court[11] held a hearing on April 17, 2018. Counsel for the Fund did not appear, so the court took Davis's arguments under advisement. The circuit court held another hearing on May 15, 2018. There, the Fund argued that it was a "regulated charity" rather than a public body. It contended that the appointments to its board, while made by elected officials, were essentially ratifications of nominees from the named school organizations. The Fund also argued that the Secretary of State's decision to include the Fund on its list of state boards was incorrect and that the South Carolina Legislative Manual did not list the Fund as a state board. Additionally, the Fund argued virtually all of its activities were covered by the FOIA-related provisions of legislation making the Fund permanent that the governor was considering. The court denied Davis's motion for summary judgment, saying that it "believe[d] that a genuine issue of material fact exist[ed] . . . ."

On June 14, 2018, the Fund filed a motion to dismiss and a motion for a protective order. In a memorandum supporting the motion to dismiss, the Fund

---

[10] It is likely both did. An affidavit sworn May 11, 2018 by Thomas Persons, the chairman of the Fund's board, states that currently "[t]here is no assistance from any government entity in contacting potential donors and soliciting donations." Persons refers to the Fund as a "highly regulated" organization. Additionally, he states that the Department "monitors incoming funds much like a turnstile would monitor passengers entering a train station."

[11] At least four different circuit court judges were involved in this litigation in Richland County. For ease of understanding, we will not refer to each of the judges by name.

argued that our supreme court's holding in *DomainsNewMedia.com v. Hilton Head Island-Bluffton Chamber of Commerce*, 423 S.C. 295, 814 S.E.2d 513 (2018) was controlling.[12]

The Fund's motion also mentioned a development outside the courtroom: legislation signed by the governor the previous month (the Act) permanently codifying the Fund and providing:

> In concert with the public charity directors, the department shall administer the public charity including, but not limited to, the keeping of records, the management of accounts, and disbursement of the grants awarded pursuant to this section. The public charity may expend up to two percent of the fund for administration and related costs. The department and the public charity may not expend public funds to administer the program. *Information contained in or produced from a tax return, document, or magnetically or electronically stored data utilized by the Department of Revenue or the public charity in the exercise of its duties as provided in this section must remain confidential and is exempt from disclosure pursuant to the Freedom of Information Act. Personally identifiable information, as described in the Family Educational Rights and Privacy Act and individual health records, or the medical or wellness needs of children applying for or receiving grants must remain confidential and is not subject to disclosure pursuant to the Freedom of Information Act.*[13]

(Emphasis added in the memo). The Fund argued that this provision was "explicit instruction from the legislature that FOIA does not apply to the normal operations of [the Fund]." The Fund also contended that, under the FOIA, meetings related to

---

[12] We discuss this case in greater detail in our analysis.

[13] The legislation also made some other changes. For example, the Act did not include the requirement that elected officials consult with school organizations for their appointments to the board.

scholarship decisions "are . . . closed to the public" under section 30-4-70(a)(1) of the South Carolina Code (2007).[14]

The circuit court held its third hearing on the matter on August 9, 2018. The court denied the Fund's motion to dismiss. It also ordered the Fund to comply with Davis's discovery requests to the extent possible.

On August 17, 2018, the Fund filed a motion for summary judgment, a memorandum on the motion for summary judgment, and a motion for judgment on the pleadings with an accompanying memorandum. In these filings, the Fund largely reiterated its arguments from the motion to dismiss.[15]

Davis filed an emergency motion for contempt and sanctions on August 22, 2018. In it, he argued that the Fund had failed to produce certain discovery. At a hearing on September 4, 2018, the circuit court held a status conference. Scheduling and discovery issues were discussed. This was followed by a motion to compel discovery and for sanctions on September 10, 2018. Additionally, Davis filed a renewal of his motion for summary judgment on September 10, 2018.

The circuit court held another hearing on October 3, 2018. On December 21, 2018, in a Form 4 order, the circuit court granted the Fund's motions for judgment on the pleadings and summary judgment. In its later written order, the circuit court noted the *DomainsNewMedia.com* decision. The circuit court found the Fund was similarly situated to the chamber of commerce in our supreme court's decision:

> Educational Credit for Exceptional Needs Children Fund registers with the Secretary of State as a public charity under Section 509 and reports to the Secretary of State as

---

[14] *See* S.C. Code Ann. § 30-4-70(a) (2007) ("A public body may hold a meeting closed to the public for . . . [d]iscussion of employment, appointment, compensation, promotion, demotion, discipline, or release of an employee, a student, or a person regulated by a public body or the appointment of a person to a public body . . . .")

[15] The Fund filed a revised memorandum in support of its motion for judgment on the pleadings on September 29, 2018, again elaborating on its arguments. In addition to its previous theories, the Fund contended that it could not be a public body because state law does not allow it to "receive, have or spend public funds." Further, it noted that state law described the Fund as an independent entity, and "provide[d] that the Department of Revenue and [the Fund] may not expend public funds to administer" the Fund. It also argued that the legislative intent of provisions setting up the fund supported its motions.

> contemplated for entities not subject to FOIA. The funding is not state funding, but rather private donations. Exceptional SC receives no support from state funding. The State has provided an avenue for Exceptional SC to exist, and for that reason this program is highly regulated and reporting intensive, like the Chamber of Commerce.

Additionally, the circuit court interpreted the adoption of the Act as "explicit instruction from the legislature that FOIA does not apply to the normal operations of [the Fund]." The circuit court added: "Likewise, according to the South Carolina Freedom of Information Act, public meetings in which applications for scholarships are reviewed and scholarships are awarded are exempt from FOIA disclosure and can be closed meetings."

On July 8, 2019, the circuit court denied Davis's motion for reconsideration with a Form 4 order. This appeal followed.

## ISSUES ON APPEAL

I.   Did the circuit court err in finding that the Fund is not a "public body" for the purposes of FOIA even though it was created by the General Assembly, is governed by a board appointed by state officials, and can be administered by the Department?

II.  Did the circuit err in granting summary judgment based in part on a finding that no public funds were expended by the Department, despite the evidence provided by Davis?

III. Did the circuit court err in finding that reporting requirements on the part of the Department could serve as a replacement for the Fund's alleged FOIA obligations?

IV.  Did the circuit court err in holding that the reporting requirements in the 2016 budget proviso were sufficient to satisfy the standards of *DomainsNewMedia.com*?

V.   Did the circuit court err in holding that the reporting requirements in the 2017 budget proviso were sufficient to satisfy the standards of *DomainsNewMedia.com*?

VI.     Did the circuit court err in basing its interpretation of the legislative intent of the earlier budget provisos partially on the later legislation approved by the General Assembly and the governor?

VII.    Did the circuit court err in construing the Act as a broad FOIA exemption rather than a "belt and suspender" provision regarding already exempt information?

## STANDARD OF REVIEW

"Declaratory judgments are neither legal nor equitable.  The standard of review for a declaratory judgment action is, therefore, determined by the nature of the underlying issue." *Bundy v. Shirley*, 412 S.C. 292, 301, 772 S.E.2d 163, 168 (2015) (citations omitted).  "The interpretation of a statute is a question of law." *DomainsNewMedia.com, LLC v. Hilton Head Island-Bluffton Chamber of Commerce*, 423 S.C. 295, 300, 814 S.E.2d 513, 516 (2018) (quoting *Sparks v. Palmetto Hardwood, Inc.*, 406 S.C. 124, 128, 750 S.E.2d 61, 63 (2013).  "Th[e appellate c]ourt may interpret statutes, and therefore resolve the case, 'without any deference to the court below.'" *Id.* (quoting *Brock v. Town of Mt. Pleasant*, 415 S.C. 625, 628, 785 S.E.2d 198, 200 (2016)).  "When the circuit court grants summary judgment on a question of law, we review the ruling de novo." *Stoneledge Lake Keowee Owners' Ass'n, Inc., v. Builders FirstSource–Se. Grp.*, 413 S.C. 630, 634–35, 776 S.E.2d 434, 437 (2015).  To the extent that Davis's request for injunctive relief proves relevant, we note that "[a]ctions for injunctive relief are equitable in nature.  In equitable actions, the appellate court may review the record and make findings of fact in accordance with its own view of a preponderance of the evidence." *Wiedemann v. Town of Hilton Head Island*, 344 S.C. 233, 236, 542 S.E.2d 752, 753 (Ct. App. 2001) (citations removed).

## LAW/ANALYSIS

## I.      PUBLIC BODIES AND THE FOIA

The South Carolina Freedom of Information Act has a far-reaching definition of what constitutes a public body subject to its terms.  According to the FOIA, a "public body" is defined as

> any department of the State, a majority of directors or their representatives of departments within the executive branch of state government as outlined in Section 1-30-10, any state board, commission, agency, and authority, any

public or governmental body or political subdivision of the State, including counties, municipalities, townships, school districts, and special purpose districts, or any organization, corporation, or agency *supported in whole or in part by public funds or expending public funds*, including committees, subcommittees, advisory committees, and the like of any such body by whatever name known, and includes any quasi-governmental body of the State and its political subdivisions, including, without limitation, bodies such as the South Carolina Public Service Authority and the South Carolina State Ports Authority. . . .

S.C. Code Ann. § 30-4-20(a) (2007) (emphasis added). The broad sweep of that definition has left room for judicial interpretation.

Perhaps the most far-reaching construction of the term "public body" comes from our supreme court's decision in *Weston v. Carolina Research & Dev. Found.*, 303 S.C. 398, 401 S.E.2d 161 (1991). In that case, the court considered the status of a foundation linked to the University of South Carolina that had received transfers of funding and real estate on behalf of university projects and research. *Id.* at 401–03, 401 S.E.2d at 163–64. The court rejected arguments that the foundation's status as a "private corporation" insulated it from the state's FOIA. *Id.* at 403, 401 S.E.2d at 164.

> The Foundation's argument that the FOIA only applies to governmental and quasi-governmental bodies would rewrite the statutory definition of "public body" by deleting the phrase, "or any organization, corporation, or agency supported in whole or in part by public funds or expending public funds." According to the Foundation's position, a corporation that cannot be labeled governmental or quasi-governmental would be exempt from the FOIA, regardless of whether it received support from public funds or expended public funds. Such a construction would obliterate both the intent and the clear meaning of the statutory definition.
>
> . . . . [T]he unambiguous language of the FOIA mandates that the receipt of support in whole or in part from public funds brings a corporation within the definition of a public

body. The common law concept of "public" versus "private" corporations is inconsistent with the FOIA's definition of "public body" and thus cannot be superimposed on the FOIA.

*Id.* At the same time, the *Weston* court laid out a limiting principle that has become increasingly important to FOIA jurisprudence in the years since.

> [T]his decision does not mean that the FOIA would apply to business enterprises that receive payment from public bodies in return for supplying specific goods or services on an arms[-]length basis. In that situation, there is an exchange of money for identifiable goods or services and access to the public body's records would show how the money was spent. However, when a block of public funds is diverted *en masse* from a public body to a related organization, or when the related organization undertakes the management of the expenditure of public funds, the only way that the public can determine with specificity how those funds were spent is through access to the records and affairs of the organization receiving and spending the funds.

*Id.* at 404, 401 S.E.2d at 165.

Our supreme court returned to that caveat several years later in *Disabato v. S.C. Ass'n of School Adm'rs*, 404 S.C. 433, 746 S.E.2d 329 (2013). There, the court did not directly address whether the term "public body" was broad enough to include the South Carolina Association of School Administrators. *Id.* at 443, 746 S.E.2d at 334. However, in discussing whether the obligation of some organizations to comply with the FOIA constituted a violation of those organizations' First Amendment rights, the *Disabato* court placed a renewed emphasis on the degree of state involvement with the organization at issue.

> [T]he application of the FOIA beyond traditional governmental entities is limited to statutorily defined public bodies, which are only those entities supported by public funds. . . . We previously recognized in *Weston* that the FOIA is ineffectual if it does not extend to such bodies, explaining that when an entity receives public funds *en masse* or manages the expenditure of public funds, "the

only way that the public can determine with specificity how those funds were spent is through access to the records and affairs of the organization receiving and spending the funds." If public bodies were not subject to the FOIA, governmental bodies could subvert the FOIA by funneling State funds to nonprofit corporations so that those corporations could act, outside the public's view, as proxies for the State. . . .

. . . . The dissent would read the FOIA as applying to a private organization that receives even a negligible amount of public funding for a discrete purpose. We made clear in *Weston* that the FOIA only applies to private entities who receive government funds *en masse*. The FOIA would not apply to a private entity that receives public funds for a specific purpose. For example, the FOIA would not apply to a private organization that receives public funds to operate a childcare center or healthcare clinic. However, the FOIA does apply to any private organization that is generally supported by public funds.

*Id.* at 433, 454–56, 746 S.E.2d at 340–41 (citations omitted) (quoting *Weston*, 303 S.C. at 404, 401 S.E.2d at 165).[16]

---

[16] This interpretation of the reach of the FOIA was one of the dividing lines between the majority opinion and the dissent.

The clear language of the statute, we said in *Weston,* mandates that an organization receiving public funds in even one transaction is a "public body" for purposes of FOIA requirements, and construing the statute to reach only governmental or quasi-governmental organizations would "obliterate both the intent and the clear meaning of the statutory definition." Thus, the statute may reach an otherwise private organization that receives even a negligible amount of public funding for a discrete purpose.

Our supreme court returned again to this issue in *DomainsNewMedia.com*. There, the court dealt with accommodations tax revenues used to fund marketing ventures by a local chamber of commerce. *See DomainsNewMedia.com*, 423 S.C. at 298, 814 S.E.2d at 514–15. The court found that a literal interpretation of the FOIA could lead to the conclusion that the transfer of tax proceeds to the chamber of commerce was enough to open the chamber's records. *Id.* at 304, 814 S.E.2d at 518. At the same time, though, the court focused on the fact that portions of the pieces of legislation setting up the system "provide a specific and comprehensive approach for the receipt, expenditure, and oversight of these funds." *Id.* The court held:

> Moreover, even in the absence of a specific statute, this [c]ourt has recognized that the applicability of FOIA to a non-governmental entity is more involved than classification as a public body due to the receipt of public funds.
>
> . . . . [In *Weston*, the supreme court] rejected the suggestion that the mere receipt or expenditure of public funds automatically and categorically transformed an otherwise private entity into a public body triggering the full panoply of FOIA requirements. We made clear that the mere receipt or expenditure of public funds did not mean "that the FOIA would apply to business enterprises that receive payment from public bodies in return for supplying specific goods or services on an arms[-]length basis." . . . . Significantly, in that case, there was not a statute or proviso governing the procedure and oversight for the expenditure of the specific funds at issue or mandating the public reporting and accountability as exists with respect to [the funds at issue in *DomainsNewMedia.com*].

*Disabato*, 404 S.C. at 460, 746 S.E.2d at 343 (quoting *Weston*, 303 S.C. at 403, 401 S.E.2d at 164) (Pleicones, J., concurring in part and dissenting in part) (footnote omitted). Justice Pleicones added later that the law "applies solely by virtue of the fact that the organization has received public funds, regardless of any relationship between the organization's publicly and privately funded activities." *Id.* at 464, 746 S.E.2d at 345.

Here, as noted, there is a specific statute (or proviso) that directs the local governments to select a DMO[17] to manage the expenditure of certain tourism funds and requires the governments to maintain oversight and responsibility of the funds by approving the proposed budget and receiving an accounting from the DMO. Thus, this is not the situation found in *Weston* wherein the funds were intended to be given to a public body and, instead, were diverted to a private organization to be spent without oversight. Through [the relevant legislation] there are accountability measures in place[,] and the public has access to information regarding how the funds are spent. Therefore, the concern in *Weston* regarding the lack of a legislatively sanctioned process mandating oversight, reporting, and accountability is not present in the expenditure of these funds.

*Id.* at 304–06, 814 S.E.2d at 518–19 (citations omitted) (quoting *Weston*, 303 S.C. at 404, 401 S.E.2d at 165). Justice Few dissented, arguing that the *Weston* court "applied that plain language [of the FOIA] to transactions that are factually indistinguishable from the Chamber's receipt and expenditure of accommodations sales tax revenues in this case[] and held the FOIA applies." *Id.* at 311, 814 S.E.2d at 521 (Few, J., dissenting). Additionally, Justice Few argued that the limiting principle in *Weston* "was never intended to create any additional requirement—or a "more involved" analysis—to determine the applicability of the FOIA." *Id*. at 311, 814 S.E.2d at 522.

The *DomainsNewMedia.com* decision was handed down May 23, 2018— before the circuit court decided this case, but days after the governor approved the legislation making the Fund permanent.

## II. STATUS OF THE FUND (Davis's Issues I–V)

Davis's first five issues—the core of the case—can all be reasonably reduced to one overarching question: Is the Fund a public body for the purposes of the FOIA? The issues of the meaning of the term "public body"; whether tax revenues support the Fund; and the correct interpretation of our supreme court's ruling in *DomainsNewMedia.com* are all focused on this threshold question. We also do not

---

[17] "DMO" stands for the designated marketing organization. *DomainsNewMedia.com*, 423 S.C. at 298, 814 S.E.2d at 515.

and should not go beyond answering that question in our consideration of the Fund's operations. Because of the unique structure of the Fund, this is a close call. However, we find that the Fund is not a public body for the purposes of the state's FOIA.

The parties have devoted a great deal of energy to arguing over the meaning of *Weston*, *Disabato*, and *DomainsNewMedia.com*. All three decisions are, of course, relevant. However, we must consider that *DomainsNewMedia.com* is the most recent of the three cases decided by our supreme court, and we can hardly contravene the most recent precedent. *See* S.C. CONST. art. V, § 9 ("The decisions of the Supreme Court shall bind the Court of Appeals as precedents."); *State v. Cheeks*, 400 S.C. 329, 342, 733 S.E.2d 611, 618 (Ct. App. 2012) ("[T]his court lacks the authority to rule against prior published precedent from our supreme court, but is bound by the decisions of the supreme court."), *aff'd as modified*, 408 S.C. 198, 758 S.E.2d 715 (2014).

Our inquiry cannot proceed as though there are not significant factual distinctions between the chamber of commerce in *DomainsNewMedia.com* and the Fund. There clearly are. For example, there is no indication in *DomainsNewMedia.com* that state government had a cooperative role in administering the chamber of commerce's marketing program. The chamber of commerce in that case was not set up by the General Assembly and had been around for decades when the marketing program was set up. *See* 423 S.C. at 298, 814 S.E.2d at 515. To our knowledge, local chambers do not have access to the state's online credit card system, do not have state employees answering the phone, and usually cannot count on promotion from state agencies on social media. Finally, a chamber of commerce carries out other activities beyond distributing public dollars. Here, the Fund's major purpose is deciding who receives scholarships indirectly supported by the state. After all, our supreme court said in its conclusion in *DomainsNewMedia.com* that "the General Assembly enacted the more narrow and targeted [accommodations tax] statute . . . to provide what it determined were the necessary accountability safeguards with regard to the expenditure of these specific funds while simultaneously protecting *the private nature of the organizations* selected to perform this marketing function." *Id.* at 307, 814 S.E.2d at 519 (emphasis added).

Nor can we ignore how closely the structure of the Fund resembles a concern our supreme court raised in *Disabato*. *See* 404 S.C. at 455, 746 S.E.2d at 340 ("If public bodies were not subject to the FOIA, *governmental bodies could subvert the FOIA by funneling State funds to nonprofit corporations so that those corporations could act, outside the public's view, as proxies for the State*. . . ." (emphasis added)).

It is hard to see how the Fund is not a nonprofit corporation acting as a proxy for the state; that seems to be its entire reason for existing. At least one of our sister courts in another state has found that its state's requirement that a public body be one that is "receiving or expending and supported in whole or in part by public funds" could be fulfilled under similar—though not precisely analogous—circumstances. *See Associated Press v. Sebelius*, 78 P.3d 486, 491–92 (Kan. Ct. App. 2003) (holding that a volunteer "team" set up by the governor-elect was not a public body for other reasons, but first finding the public funding requirement satisfied when "there were 12 state employees assigned to" the team, and "state employees continued to receive their salary while assisting [the team]").

Nonetheless, we hold that, under *DomainsNewMedia.com*, the Fund is not a public body for the purposes of the FOIA. The support that the Fund receives in the form of likely fleeting assistance from state officials and use of the state fundraising platform is *de minimis* rather than the diversion of "a block of public funds . . . *en masse*" or "the management of the expenditure of public funds." *Weston*, 303 S.C. at 404, 401 S.E.2d at 165. *See also Disabato*, 404 S.C. at 454–55, 746 S.E.2d at 340 ("[T]he application of the FOIA beyond traditional governmental entities is limited to statutorily defined public bodies, which are only those entities supported by public funds."); *id.* at 456, 736 S.E.2d at 341 ("[T]he FOIA does not apply to a recipient of public funds as a condition of the receipt of the funds. Rather, the general support of an entity through public funds brings it within the class of entities to which the FOIA applies."). Furthermore, the legislation creating the Fund includes a reporting and accountability mechanism not unlike the measures considered relevant by the *DomainsNewMedia.com* court.[18] *See* 423 S.C. at 304, 814 S.E.2d 518 (noting statutes that "provide a specific and comprehensive approach for the receipt, expenditure, and oversight of these funds," and stating those "play the lead role in our disposition of this case"). *See also Wilder v. S.C. State Highway Dep't*, 228 S.C. 448, 454, 90 S.E.2d 635, 638 (1955) ("It is well settled that where there is a statute dealing with a subject in general terms and another statute dealing with a part of the same subject in a more minute and definite way, the special statute will be considered as an exception to, or qualification of, the general statute and given effect."). Finally, the Fund is at least technically independent of the state. *See Disabato*, 404 S.C. at

---

[18] *See* S.C. Code Ann. § 12-6-3790(B)(5) (Supp. 2022) (requiring annual reports on the Fund's operations, including "the number and total amount of grants issued to eligible schools in each year" and "a copy of a compilation, review, or audit of the fund's financial statements, conducted by a certified public accounting firm").

454–55, 746 S.E.2d at 340 (limiting the reach of FOIA "beyond traditional governmental entities").

Even if we were to hold that the Fund is a public body under the FOIA, that would not require the Fund to release many or perhaps most of its documents. The Legislature has been clear on that:

> Information contained in or produced from a tax return, document, or magnetically or electronically stored data utilized by the Department of Revenue or the public charity in the exercise of its duties as provided in this section must remain confidential and is exempt from disclosure pursuant to the Freedom of Information Act. Personally identifiable information, as described in the Family Educational Rights and Privacy Act and individual health records, or the medical or wellness needs of children applying for or receiving grants must remain confidential and is not subject to disclosure pursuant to the Freedom of Information Act.

S.C. Code Ann. § 12-6-3790(B)(4) (Supp. 2022). We must interpret this statute as it comes to us, and the plain meaning prevails.

That does not mean that the status of the Fund would be an academic point. Rather, there is at least one aspect of Davis's challenge that would be unaffected by this: whether the Fund's meetings must be at least partially open to the public.

We categorically disagree with the circuit court's conclusion that the meetings of a public body "can be closed meetings" if aspects of the discussion at those meetings—even all aspects—are exempt from the FOIA. That is not what FOIA says. *See* S.C. Code Ann. § 30-4-60 (2007) ("*Every meeting of all public bodies shall be open to the public unless closed pursuant to Section 30-4-70 of this chapter.*" (emphasis added)). Instead, the General Assembly has provided that certain issues may be discussed in closed session. *See* § 30-4-70(a) (listing reasons that may justify executive sessions). And the FOIA lays out a procedure for going into executive session that requires a public vote to do so and prohibits a vote in executive session to take action. *See* S.C. Code Ann. § 30-4-70(b) (2007) ("No action may be taken in executive session except to (a) adjourn or (b) return to public session. The members of a public body may not commit the public body to a course of action by a polling of members in executive session.").

In any event, we need not address that issue directly, because under our precedents, the Fund is not a public body for the purposes of the FOIA. That outcome is dictated by the majority opinion in *DomainsNewMedia.com* because (1) the legislative enactment discussed in that opinion is similar enough in nature to the legislative enactment concerning the Fund in the present case in that both have independent reporting and accountability requirements, which was a key factor in the majority's analysis in *DomainsNewMedia.com*; and (2) the legislative enactment concerning the Fund expressly states that the funds are not public funds. The occasional and relatively minor activities undertaken by the Department's employees do not represent the *en masse* diversion of state resources required by *DomainsNewMedia.com* to hold otherwise.

Davis contends that this line of analysis is wrong. He notes that "the South Carolina Attorney General's Office has . . . specifically conclud[ed] that there exists no '*de minimis*' exception to [FOIA's] applicability for public funding which is indirect or insignificant." We respect the Attorney General's Office and its work, but we need not determine whether it has endorsed a *de minimis* exception, because our supreme court has. *See DomainsNewMedia.com*, 423 S.C. at 305, 814 S.E.2d at 518 (holding that the *Weston* court "rejected the suggestion that the mere receipt or expenditure of public funds automatically and categorically transformed an otherwise private entity into a public body triggering the full panoply of FOIA requirements").

Additionally, Davis argues that the scholarship dollars at issue here are public money. We disagree. Davis's sole authority for this contention is an opinion of the Attorney General's Office characterizing the funds as public. However, one of the cases cited in that opinion stands for the opposite proposition; the quoted parenthetical from that case, *Elliott v. McNair*, refers to a portion of the court's ruling laying out the view that our supreme court *was rejecting*. *See* 250 S.C. 75, 90, 156 S.E.2d 421, 429 (1967) (quoting a Florida Supreme Court case as a "leading" example of "decisions contrary to the view hereinbefore expressed"). Considering the status of industrial revenue bonds used to help a manufacturing project and paid off by a manufacturer, our supreme court distinguished those funds from public funds. *See id.* ("It is our view, however, that the money which will be received by the [c]ounty [b]oard in this case is impressed with *a trust that it be used for the purpose for which it was obtained*, the construction of a project, for which reason *the money does not become public money* whose expenditure would otherwise be confined to the general public good."). Likewise, the private funds contributed to the Fund are used for specified purposes—the scholarships—and would not become public funds even if they were directly held by the Department or an indisputably

public body.  The other authorities cited by the Attorney General's opinion are an appeals court decision from Arizona, a South Carolina statutory provision concerning funds of the Department of Commerce, and a quote from *American Jurisprudence* that appears to be outdated.[19]

We emphasize that this court has not been called upon to evaluate any other policy or legal aspect of the Fund's establishment or structure.  While we offer no opinion on those questions, they would in some cases present more difficult considerations.  We are instead answering the far narrower issue presented to us: Whether, under the current circumstances, the Fund is a public body for the purposes of the FOIA.  Given our precedents, it is not.

## III.  EFFECT OF THE ACT

A related question is Davis's contention that the circuit court erred in using the Act to interpret the General Assembly's original intent in the proviso.  We do not need to address this issue, because Davis abandoned it on appeal.

Davis cites no legal authority for his argument that the circuit court could not consider a subsequent act of the General Assembly as clarifying the intent of the budget provisos.  The only citations of any kind are to the record and to the act itself.

## IV.  'BELT AND SUSPENDER' ARGUMENT

Davis argues that the Act is "nothing more than a restatement of FOIA exemptions," and thus should be read as a "belt and suspender" provision.  Davis abandoned this argument on appeal, but it has no merit in any event.

Again, Davis cites no authority to support his argument that the General Assembly intended nothing more than a reiteration of current law.  Even so, without some cursory evidence, interpreting the statute this way would run contrary to our canons of statutory construction.  *See Centex Int'l, Inc. v. S.C. Dep't of Revenue*, 406 S.C. 132, 139, 750 S.E.2d 65, 69 (2013) ("The cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature." (quoting *Sloan v. Hardee,* 371 S.C. 495, 498, 640 S.E.2d 457, 459

---

[19] We also believe it is possible that Davis abandoned this argument in his reply brief, where he states:  "Respondent also wants to rely upon its belief that the scholarship funds distributed are not public funds.  That finding is not necessary as *it is irrelevant*." (emphasis added).

(2007)); *id.* at 145, 750 S.E.2d at 72 (noting that "the legislature is presumed to be aware of prior legislation and does not perform futile acts").

## CONCLUSION

For the foregoing reasons, the circuit court's order is **AFFIRMED**.

**MCDONALD, J., and LOCKEMY, A.J., concur.**